## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF FLORIDA
## GAINESVILLE DIVISION

**GARNET SHORTRIDGE,**

     **Plaintiff,**

**vs.**                                                            **Case No. 1:13cv184-MP/CAS**

**CAROLYN W. COLVIN, Acting**
**Commissioner of Social Security,**

     **Defendant.**

_____/

## <u>REPORT AND RECOMMENDATION</u>

     This is a Social Security case referred to the undersigned United States Magistrate

Judge for a report and recommendation pursuant to 28 U.S.C. § 636(b) and Local Rule

72.2(D).   It is now before the Court pursuant to 42 U.S.C. § 405(g) for review of the final

determination of the Acting Commissioner (Commissioner) of the Social Security

Administration (SSA) denying Plaintiff's application for Supplemental Security Income

(SSI) under Title XVI of the Social Security Act.   After careful consideration of the record,

it is recommended that the decision of the Commissioner be affirmed.

Case No. 1:13cv184-MP/CAS

## I.  Procedural History

On May 30, 2006, Plaintiff, Garnet Shortridge, filed an application for SSI benefits alleging disability beginning June 1, 2004.   R. 20, 87-89, 97.   (Citations to the Record shall be by the symbol R. followed by a page number that appears in the lower right corner.)   The claim was initially denied on October 3, 2006, and upon reconsideration on February 8, 2007.   R. 20, 52-55.   On March 5, 2007, Plaintiff requested a hearing.   R. 20, 65.

On November 8, 2008, a hearing was conducted in Ocala, Florida, by Administrative Law Judge (ALJ) Apolo Garcia.   R. 20, 27-50.   Plaintiff was represented by Joseph T. Lander, an attorney.   R. 20, 59-60.   Plaintiff testified during the hearing. R. 20, 29-42.   Richard J. Hickey, an impartial vocational expert, testified.   R. 20, 42-49, 85-86 (Resume).

On February 12, 2009, ALJ Garcia entered a decision and determined that Plaintiff was not disabled.   R. 20-26.   On February 23, 2011, the Appeals Council denied Plaintiff's request for review, R. 10.   R. 1-3.   On April 21, 2011, Plaintiff filed a Complaint in this Court.   On April 3, 2012, U.S. Magistrate Judge Gary R. Jones entered a Report and Recommendation and recommended that the decision of the Commissioner be reversed and remanded pursuant to sentence four of 42 U.S.C.

§ 405(g) for further proceedings to "(i) evaluate and determine whether Plaintiff has any past relevant work; (ii) if Plaintiff does not have past relevant work or if she cannot perform her past relevant work, the ALJ should perform the required analysis at Step Five to determine whether Plaintiff can perform other work; and (iii) make a specific finding as to whether Plaintiff's moderate limitations in concentration, persistence or pace are accounted for in the record medical evidence."   R. 363-82.   On May 7, 2012, Chief U.S. District Court Judge M. Casey Rodgers adopted the recommendation and remanded the case in accordance with the recommendation.   R. 361-62.   On October 16, 2012, the Appeals Council remanded the case to an ALJ for further proceedings consistent with district court order.   R. 383-86.

On May 17, 2013, ALJ William H. Greer, held a video hearing.   R. 296, 313-46. The Plaintiff appeared in Gainesville, Florida, and ALJ Greer presided over the hearing from Jacksonville, Florida.   R. 296, 313.   Plaintiff was represented by N. Albert Bacharach, Jr., an attorney.   R. 15, 296, 313.   Plaintiff testified.   R. 315-39.   Ronald J. Spitznagel, Ed.D., CRC, CVE, an impartial vocational expert, testified during the hearing. R. 296, 339-46, 453 (Resume).   On July 19, 2013, ALJ Greer entered his decision and determined that Plaintiff was not disabled based, in part, upon his consideration of the three issues noted above.   R. 296-307.   On September 24, 2013, doc. 1, Plaintiff filed a

Complaint in this Court and both parties filed memoranda of law, which have been considered.   Docs. 19 & 20.

## II.  General Legal Standards Guiding Judicial Review

This Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and premised upon correct legal principles.   Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).   "Substantial evidence is more than a scintilla, but less than a preponderance.   It is such relevant evidence as a reasonable person would accept as adequate to support a conclusion."   Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted); Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005).   "The Commissioner's factual findings are conclusive if supported by substantial evidence."   Wilson v. Barnhart, 284 F.3d 1219, 1221 (11th Cir. 2002).   "If the Commissioner's decision is supported by substantial evidence we must affirm, even if the proof preponderates against it."   Phillips v. Barnhart, 357 F.3d 1232, 1240, n. 8 (11th Cir. 2004) (citations omitted).   The Court must give "substantial deference to the Commissioner's decision."   Dyer v. Barnhart, 395 F.3d 1206, 1211 (11th Cir. 2005). The reviewing court is not free to reweigh the evidence or substitute its judgment for that of the Commissioner.   Bloodsworth, 703 F.2d at 1239.   "A 'substantial evidence' standard, however, does not permit a court to uphold the Secretary's decision by referring

only to those parts of the record which support the ALJ.   A reviewing court must view the entire record and take account of evidence in the record which detracts from the evidence relied on by the ALJ."   Tieniber v. Heckler, 720 F.2d 1251, 1253 (11th Cir. 1983). "Unless the Secretary has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's 'duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.'"   Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir. 1981) (citations omitted).

A disability is defined as a physical or mental impairment of such severity that the claimant is not only unable to do past relevant work, "but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."   42 U.S.C. § 423(d)(2)(A).   A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. § 423(d)(1)(A); *see* 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than 12 months. Barnhart v. Walton, 535 U.S. 212 (2002).

"In making an initial determination of disability, the examiner must consider four factors: '(1) objective medical facts or clinical findings; (2) diagnosis of examining physicians; (3) subjective evidence of pain and disability as testified to by the claimant and corroborated by [other observers, including family members], and (4) the claimant's

age, education, and work history.'"   Bloodsworth, 703 F.2d at 1240 (citations omitted).

The Commissioner analyzes an adult's claim in five steps.   20 C.F.R.

§ 416.920(a)(4)(i)-(v).

1.     Is the individual currently engaged in substantial gainful activity?

2.     Does the individual have any severe impairments?

3.     Does the individual have any severe impairments that meet or equal those listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P?

4.     Does the individual have the RFC to perform work despite limitations and are there any impairments which prevent past relevant work?[1]

5.     Do the individual's impairments prevent other work?

A positive finding at step one or a negative finding at step two results in disapproval of the application for benefits.   A positive finding at step three results in approval of the application for benefits.   At step four, the claimant bears the burden of establishing a severe impairment that precludes the performance of past relevant work.   Consideration is given to the assessment of the claimant's RFC and the claimant's past relevant work. If the claimant can still do past relevant work, there will be a finding that the claimant is not disabled.   If the claimant carries this burden, however, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform other work in the national economy in light of the claimant's

---

[1]   A residual functional capacity (RFC) is the most a claimant can still do despite limitations.   20 C.F.R. § 416.945(a)(1).   It is an assessment based upon all of the relevant evidence including the claimant's description of her limitations, observations by treating and examining physicians or other persons, and medical records.   *Id.*   The responsibility for determining claimant's RFC lies with the ALJ.   20 C.F.R. § 416.946(c).

RFC, age, education, and work experience.   Phillips, 357 F.3d at 1237; Jones v. Apfel,

190 F.3d 1224, 1229 (11th Cir. 1999); Chester, 792 F.2d at 131; MacGregor v. Bowen,

786 F.2d 1050, 1052 (11th Cir. 1986); 20 C.F.R.

§ 416.920(a)(4)(v), (e) & (g).   If the Commissioner carries this burden, the claimant must

prove that he or she cannot perform the work suggested by the Commissioner.   Hale v.

Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).

## III.  The ALJ's Findings

1.   "The claimant has not engaged in substantial gainful activity since May 30, 2006, the application date."   R. 298.

2.   "The claimant has the following severe impairments: osteoarthritis and obesity."   Id.   The ALJ addressed (on remand) issue number three and determined that Plaintiff has mild limitation in the functional area of concentration, persistence or pace.   R. 300.

3.   "The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1."   R. 300.

4.   "[T]he claimant has the residual functional capacity [RFC] to perform light work as defined in 20 CFR 416.967(b) except she is limited to 5th grade level of math and reading level with special education (based upon Exhibit 1F).   She can sit up to 7 hours per day but would need to get up once every hour for 1-2 minutes; walk for 4 hours in an 8-hour workday but not for more than 15 minutes at a time.   She can lift up to 20 pounds occasionally and up to 10 pounds frequently.   She is limited to occasional bending, stooping, climbing ramps or stairs, crouching or kneeling.   She is precluded from crawling or climbing ladders, ropes or scaffolds. She can occasionally reach above shoulder level.   Work can be unskilled or semi-skilled."   R. 300-01.

5.   "The claimant is unable to perform any past relevant work."   R. 305.   The ALJ considered (on remand) issue number one and noted that Plaintiff had past relevant work as a nursery school attendant, Dictionary of Occupational Titles (DOT) number 359.677-018, with a light exertional level and an SVP [specific vocational preparation] (skill level) of 4.   Id.   The ALJ further noted that "[t]his job

requires exertional limitations beyond those set forth in the established [RFC]." *Id.*

6.   "The claimant was born on March 1, 1981 and was 25 years old, which is defined as a younger individual age 18-49, on the date the application was filed." *Id.*   "The claimant has a limited education (she has a special education diploma and is able to read and perform math at 5th grade level) and is able to communicate in English."   R. 306.

7.   "Considering the claimant's age, education, work experience, and [RFC], there are jobs that exist in significant numbers in the national economy that the claimant can perform."   *Id.*   The ALJ considered (on remand) issue number two and determined, with the assistance of the vocational expert, that Plaintiff can perform several jobs: (1) animal shelter clerk, DOT number 249.367-010, SVP of 3, and sedentary; (2) order clerk, food and beverage, DOT number 209. 567-014, SVP of 2, and sedentary; (3) surveillance system monitor, DOT number 279. 367-010, SVP of 2, and sedentary; (4) gate guard, DOT number 372. 667-030, SVP of 3, and light; and (5) office helper, DOT number 239. 567-010, SVP of 2, and light.   R. 306-07.

8.   "The claimant has not been under a disability, as defined in the Social Security Act, since May 30, 2006, the date the application was filed."   R. 307.

## IV.   Relevant Medical and Other Evidence; Vocational Expert's Testimony

### A.   Introduction

Plaintiff does not find fault with ALJ Greer's recitation of the evidence.   Doc 19. Rather, Plaintiff selectively refers to evidence that she asserts supports her claim of disability.   *Id.* at 5-24.   Plaintiff refers, doc. 19 at 5-6, to a February 1999, Public Schools Psychoeducational Evaluation Report (Report) performed when Plaintiff was in the 11th grade in high school.   R. 194-201.   Plaintiff's Full Scale IQ score was 78 and in the "Low" category, which generally means that "a student with this level of cognitive ability is likely to struggle to learn new skills and concepts in most or all academic areas" and "[f]or this reason, extensive modification and accommodation of curriculum and instruction may

be necessary for the student to be successful."   R. 196.   Plaintiff was also administered

the Wechsler Individual Achievement Test (WIAT), which indicated Plaintiff's academic

skills in reading, mathematics, and written language were at the level of a ten year old, 5th

grade student.   R. 197.   The Report also provides the results of teacher and parent

ratings of Plaintiff in several categories and the results from an interview with Plaintiff by

the school psychologist.   R. 198-99.   The summary and conclusions are reported:

> Current evaluation results indicate that Garnet's intellectual functioning is in the
> low category of cognitive ability.
>
> Academic achievement is at expectancy for her age and learning ability.
>
> Garnet is also exhibiting serious emotional/behavioral problems, and evaluation
> results indicate that she demonstrates the following characteristic(s) of an
> emotional handicap:
>
> An inability to achieve adequate academic progress which cannot be explained by
> intellectual, sensory, or health factors.   An inability to build and maintain
> satisfactory interpersonal relationships with peers and teachers.   A general
> pervasive mood of unhappiness or depression.

R. 200.   Suggestions were made for future interventions.   *Id.*

Plaintiff also refers to documents, doc. 19 at 6-7, which show her earnings from

1998 ($1,561.91-Winn Dixie Stores), 2000 ($2,862.00- Goodnews Ministries and Child

Care), 2001 ($1,910.65- Goodnews Ministries and Child Care), and 2004

($793.44-Woneff Longwood LLC, Robert Mayer, sole member), and no earnings in any

other years from 1998 through 2013.   R. 91, 468-69, 471-76.   Plaintiff suggests that she

"has no past relevant work" and concludes that "[r]ecords shows [sic] no significant past

work with earnings of $12,480.00 between 1998 and 2011."   Doc. 19 at 7; *see*

R. 377 ($7,128.00-for 1998, 2000, and 2001).

During the hearing, ALJ Greer asked Plaintiff if she had worked anywhere in her life full-time for longer than three months.   R. 317.   Plaintiff responded that she worked at Goodnews Ministries and Child Care in 1999 and into 2000, although the ALJ noted that it appeared she worked there in 2000 into 2001.   *Id.*; *see also* R. 473-74 (working at Goodnews Ministries and Child Care in 2000 to 2001).   Plaintiff testified that she worked with kids--"put them down for naps" and "took them to the restroom."   R. 318.   She thought she was fired, but did not know why.   *Id.*   Based on Plaintiff's testimony regarding this work, the vocational expert testified that the job was classified as a nursery school attendant, <u>DOT</u> number 359.677-018, light work, with an SVP of 4. R. 339; *see* R. 305 (ALJ determination that Plaintiff unable to perform past relevant work as nursery school attendant).

During her prior hearing in November 2008 before ALJ Garcia, Plaintiff testified she worked at a childcare center for "[a] year and two to three months."   R. 32.   Plaintiff believed she received on-the-job training.   R. 31.   She left the job because she "just got tired of working there."   R. 32.   She "was doing the same old stuff over and over, and [she] just got tired of doing it."   R. 32-33.   She enjoyed working with the kids, but not "the cleaning part."   R. 33.   She would like to work in child day care with kids again, but was unsure if she would be able.   *Id.*; *see also* R. 34-37, 145-46.[2]

---

[2]   A "Work History Report-Form SSA-3369" states, in part, that Plaintiff worked as a teacher aid at a large day care center from 1998 to 2001.   R. 168; *see* R. 102 (Disability Report-Adult-Form SSA-3368).   Plaintiff worked five hours a day, five days a week at the rate of $6.00 per hour.   R. 169.   Plaintiff cleaned, helped with breakfast and lunch.   *Id.* Plaintiff walked, stood, and sat, each for one hour a day and stooped, kneeled, handled, grabbed, or grasped big objects and reached for one hour each day.   R. 170.   She lifted

Judge Jones concluded that ALJ Garcia erred at the step four determination that Plaintiff could perform her past relevant work stating, in part, that "the ALJ erred by assuming that Plaintiff's past work qualified as past relevant, or at a minimum, because the ALJ never addressed the issue the Court cannot determine on this record that the work identified by the ALJ as past relevant work qualifies as such.   In either case, reversal and remand is warranted."   R. 375-76.   ALJ Garcia had determined that Plaintiff could perform her past relevant work as a bagger and fast food worker.   R. 25-26.   As noted by Judge Jones, ALJ Garcia did not address whether these jobs "constituted past relevant work even though the record of Plaintiff's prior work experience evidences" her earnings as noted above, "well below the threshold amounts necessary for any of Plaintiff's prior work positions to qualify as past relevant work." R. 377 (citation omitted).[3]   Judge Jones also questioned whether "some of that work constituted sheltered employment because it appears that the work was performed or occurred as part of a community based instruction program that was an element of

---

trash and carried it about 20 to 30 feet.   She frequently lifted 25 pounds, but the heaviest weight lifted and carried was 20 pounds.   *Id.*   She did not use machines, equipment, or tool; did not use technical knowledge or skills; and did not do any writing, complete reports, or perform similar duties.   *Id.*

   [3]   ALJ Garcia did not determine whether Plaintiff could perform her past work as a nursery school attendant or child day care worker, R. 25-26, although he noted that Plaintiff worked "at a Day Care Center," R. 23.   During the hearing before ALJ Garcia, the vocational expert classified this work as child care center work, <u>DOT</u> number 359.677-018, light exertion, with an SVP of 4 (semi-skilled).   R. 45.   Plaintiff clarified that she "set out the places for their snacks and stuff.   And [she] rubbed the backs of the kids when, at naptime to help them fall asleep and stuff.   And watch them and make sure they were okay and stuff.   But organizing stuff for them to do was, the main teachers did that." R. 45-46.   The skills acquired in this job would not transfer to other jobs according to the vocational expert.   R. 46.

Plaintiff's special education program at Edgewater High School. (R. 186-88)."   R. 377.

The February 1999 Report for the 8/1999-6/2000 school year has a section pertaining to "exceptional education services" and lists three forms of instruction, each provided on a daily basis.   "Small group instruction" and "social skills training were to be provided in the "ESE classroom" and "community-based instruction" provided on a "hospitality jobsite."   R. 187.   As noted above, earnings records indicate Plaintiff worked at Goodnews Ministries and Child Care in 2000 and 2001, although it is uncertain when Plaintiff began this work in 2000.   R. 92.

Plaintiff refers to her mother's report to the Social Security Administration (SSA), R. 133-40; Robert A. Greenberg, M.D.'s, September 6, 2005, consultative examination, R. 236-37; Eric C. Puestow, M.D.'s, May 30, 2006, SSA's disability determination, R. 52; Janet Attlesey, M.D.'s, May 30, 2006, SSA disability determination, R. 54; Linda Abeles, Ph.D.'s, September 22, 2006, consultative psychological examination, R. 239-40; Val Bee, Psy.D's, September 29, 2006, Psychiatric Review Technique (PRT), R. 242-55, and Dr. Bee's September 29, 2006, Mental Residual Functional Capacity Assessment, R. 256-59; and Alejandro Vergara, M.D.'s, February 2, 2007, PRT, R. 279-92.   Doc. 19 at 7-10.   Plaintiff refers to the colloquy between the ALJ and the vocational expert, doc. 19 at 10-11, and between Plaintiff's counsel and the vocational expert, doc. 19 at 11-16.

Plaintiff also quotes extensively from "ALJ Garcia's decision after remand," doc 19 at 17-24.   ALJ Garcia's decision was the first decision, which was reversed and remanded, and is not the subject of this judicial review, and not particularly helpful since

ALJ Garcia stopped the analysis at step four and did not proceed to step five, R. 20-26.

On remand, ALJ Greer, not ALJ Garcia, concluded that Plaintiff is unable to perform any

past relevant work as a nursery school attendant, proceeded to step five, and concluded

that Plaintiff is capable of performing several jobs.   R. 306-07.

### B.   Relevant Medical and Other Evidence

The medical and other evidence considered by ALJ Greer is set forth in his

decision at pages 298 through 307 and is quoted below.   In particular, at step two, ALJ

Greer made the following findings:

> The claimant is obese.   Though this impairment is not a "listed" impairment, the
> effect that this condition has on the claimant's overall ability to perform work
> related functions, either singly or in combination with other impairments, has been
> considered in accordance with SSR 02-1p.
>
> The claimant's medically determinable mental impairments of depression,
> borderline intellectual functioning and attention deficit hyperactivity disorder,
> considered singly and in combination, do not cause more than minimal limitation in
> the claimant's ability to perform basic mental work activities and are therefore
> nonsevere.
>
> On September 26 [sic], 2006, the claimant presented to Linda Abeles, Ph.D. for a
> consultative psychological exam.   She reported leg pain upon presentation and
> stated that she graduated from high school with a special diploma.   She denied
> any receipt of mental health treatment.   She reported that she could care for her
> daily needs, prepare meals and perform household chores.   She reported lying in
> bed and watching television.   IQ testing revealed full scale score of 72. Diagnoses
> included attention deficit/hyperactivity disorder and borderline intellectual
> functioning with a GAF of 65 (Exhibit 4F).[4]   However, Dr. Abeles opined that the

---

4   The American Psychiatric Association: *Diagnostic and Statistical Manual of
Mental Disorders* (DSM-IV-TR) (4th Ed. Text Revision 2000), includes the GAF scale that
is primarily used by mental health practitioners.   The GAF Scale is used to report "the
clinician's judgment of the individual's overall level of functioning" (with regard to only
psychological, social, and occupational functioning) and "may be particularly useful in
tracking the clinical progress of individuals in global terms, using a single measure."   *See*
DSM-IV-TR 32-34.   The GAF scale is divided into 10 ranges of functioning, each with a

claimant's current level of functioning would probably preclude her from obtaining or maintaining employment in that she would have a great deal of difficulty in performing her job on a consistent basis (Exhibit 4F).

A GAF of 61-70 is inconsistent with a finding of total disability as it indicates some mild symptoms which cause some difficulty in social, occupational, or school functioning, but such an individual generally functions pretty well and has some meaningful interpersonal relationships.   Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. Washington DC, American Psychiatric Association, 1994.

On September 29, 2006, DDS mental health specialist, Val Bee, Psy.D. reviewed the available medical evidence and opined that the claimant's organic mental disorder (BIF and ADHD) caused moderate functional limitations in activities of daily living and in maintaining concentration, persistence or pace (Exhibit 6F). The claimant was capable of appropriate and cooperative interaction.   She might have difficulty with detailed learning and concentration on complex or simultaneous demands but mentally capable of well- structured task activity (Exhibit 7F).

---

10-point range in the GAF scale.   *Id.   See* Nichols v. Astrue, Case No. 3:11cv409/LC/CJK, 2012 U.S. Dist. LEXIS 119347, at *26-29 (N.D. Fla. Aug. 7, 2012) (discussing GAF scale).   A GAF scale rating of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning.   DSM-IV-TR 34.   A GAF scale rating of 61 to 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well and has some meaningful interpersonal relationships.   *Id.*

The "Commissioner has declined to endorse the GAF scale for 'use in the Social Security and SSI disability programs' and has indicated that GAF scores have no 'direct correlation to the severity requirements of the mental disorders listings.'"   Wind v. Barnhart, 133 F. App'x 684, 692 n.5 (11th Cir. 2005) (citing 65 Fed. Reg. 50746, 50764-65 (Aug. 21, 2000)).   In the Fifth Edition of the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) (5th ed. 2013), "[i]t was recommended that the GAF be dropped from DSM-5 for several reasons, including its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice.   In order to provide a global measure of disability, the WHO Disability Assessment Schedule (WHODAS) is included, for further study, in Section III of DSM-5 (see the chapter "Assessment Measures")."   DSM-5 at 16; *see* Finley v. Colvin, Civil Action No. 3:12-7908, 2013 WL 6384355, at *23 n.9 (S.D. W.Va. Dec. 5, 2013) ("It should be noted that in the latest edition of the [DSM], the GAF scale was abandoned as a measurement tool.").

Review of the treatment records from Dixie County Health Department reveal that the claimant sporadically complained of some depression but there is no indication that she received any treatment or referrals to any mental health specialists (Exhibit 8F/2, 12F/17).

On January 23, 2007, DDS mental health specialist, Alejandro Vergara M.D. reviewed the available medical evidence and opined that the claimant was capable of simple, repetitive type tasks and assignments.   She might have difficulty dealing appropriately with changes in the work setting or if she attempted to set realistic goals independently (Exhibit 9F).

On February 2, 2007, DDS mental health specialist, Alejandro Vergara, M.D. reviewed the available medical evidence and opined that claimant's BIF and ADHD by history caused mild limitations in activities of daily living and moderate limitations in concentration, persistence or pace (Exhibit 11F).

In making this finding, the undersigned has considered the four broad functional areas set out in the disability regulations for evaluating mental disorders and in section 12.00C of the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1).   These four broad functional areas are known as the "paragraph B" criteria.

The first functional area is activities of daily living. In this area, the claimant has mild limitation.   She uses the restroom and takes care of the 18 dogs and 10 cats (feeds them).   She does laundry and dishes.   She testified that she cleans the bathroom once a week but only sleeps occasionally.   She denied having a valid driver's license.   She testified that she helps with the grocery shopping.   She accompanies her grandmother and is able to carry the bags into the house. She admitted that she is able to microwave food.   She reported that she has no problems in her personal care (Exhibit 3E/2).

The next functional area is social functioning.   In this area, the claimant has mild limitation.   She lives with her grandmother.   She denied having any issues getting along with other people.   She testified that she talks to other people in the grocery store if she has a question or if someone asks her a question.   She reported that she gets along with authority figures and handles changes in routine "very good" (Exhibit 3E/7).

**As to issue #3**, the third functional area is concentration, persistence or pace.   In this area, the claimant has mild limitation.   She testified that she watches a lot of television.   She testified that her computer is broken; however, she admitted that she knows how to use a computer and do internet searches.   She testified that she could watch an hour-long television show.   She reported that she is able to

handle a savings account, count change and use money orders (Exhibit 3E/4). She reported that she is able to always pay attention, follow written instructions "very good," and follow spoken instructions "good" (Exhibit 3E/6).

The fourth functional area is episodes of decompensation.   In this area, the claimant has experienced no episodes of decompensation which have been of extended duration.

Because the claimant's medically determinable mental impairments cause no more than "mild" limitation in any of the first three functional areas and "no" episodes of decompensation which have been of extended duration in the fourth area, they are nonsevere (20 CFR 416.920a(d)(1)).

The limitations identified in the "paragraph B" criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process.   The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p). Therefore, the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the "paragraph B" mental function analysis.

R. 298-300 (emphasis added).   At step four, ALJ Greer made the following findings in

support of his RFC determination:

At the hearing, she testified that she graduated high school from special education classes.   She alleged that she read on a kindergarten level.   She admitted that she could read and write a grocery list.   She admitted she could read simple directions, add and subtract.   She also could multiply and divide "small numbers" (would have to write out more than 3 numbers for multiplication/division).   She testified that she has worked for a daycare in the past (for about one year).   She denied looking for work in the past couple of years, because she testified that she lives out in the country and there is not really any work.   She uses a debit card (Food stamps) to pay for groceries.

She alleged pain in her upper back and shoulder pain.   She testified that she could not work on a full-time basis, because she is unable to stand for long periods of time.   For example, if she was cooking a hamburger, she could not judge whether it was done.   She could stand for "maybe an hour."   She stated that if she sat down for 15 minutes, she could probably stand for another hour.   She

testified that she could walk about one block before her upper back and shoulders begin to hurt.   She admitted that she could lift a gallon of milk.

She alleged dislocating her knee recently when she stepped onto a step stool at home.   She denied any problems with her left knee.   She denied having any pain in her knee.   She testified that it had been a couple of years since her low back had hurt her ("a while").

She admitted that she has pets (cats and dogs).   She testified that the heaviest bag of food weighed 50 pounds.   She admitted that she could lift this amount a few times per day but not repetitively.   She testified that she is 5'9" and weighs 273 pounds.

She testified that she is unable to sit still (and believes it is more in her brain).   She alleged that she has learning disability.   She stated that she is unable to tell time (except on digital clock).   She alleged that she has limited reading abilities although she admitted to being able to read directions on microwavable food items.   She also admitted that she makes up the grocery list every month.   She admitted that she looks at the name brand and prices when she goes grocery shopping.

She admitted that her most recent medical treatment has been through Dixie County Health Department.   She testified that she also had her gallbladder surgery at Shands 3-4 years ago at Shands but denied any problems from that surgery.   She denied taking any prescription medications.   She denied that there were any prescription medications that were prescribed but she was not filling. When asked why she stopped getting medications, she replied that there were probably no refills left and she did not need it any more (Flexeril and Tramadol).

She testified that she lives in a trailer with her grandmother.   She testified that she usually wakes up around 9-10 a.m.   She uses the restroom and takes care of the 18 dogs and 10 cats (feeds them).   She does laundry and dishes.   She testified that she cleans the bathroom once a week but only sweeps occasionally. She denied having a valid driver's license.   She testified that she helps with the grocery shopping.   She accompanies her grandmother and is able to carry the bags into the house.   She testified that she watches a lot of television.   She testified that she usually lays in a bed while watching television.

Review of education records provided by Orange County Public Schools reveal that the claimant underwent evaluation on February 25, 1999 and IQ testing that revealed low intellectual functioning scores.   School records indicate that she was special education classes due to ADHD and borderline intellectual functioning.

She showed some behavior problems most likely related to hyperactivity (Exhibit 1F).

Review of the medical evidence shows that the bulk of the claimant's medical treatment has been through Dixie County Health Department for her general health care needs as well as annual exams. She treated for unrelated issues such as ear pain and gallbladder issues (Exhibits 2F, 8F and 12F).   In 2004, her weight was noted to be 263 pounds and she was noted to be 5'11" (Exhibit 2F/10).   Prior physical exams revealed normal musculoskeletal findings (Exhibit 2F/7, 9, 10).

In March 2006, the claimant complained of some intermittent right leg pain for which she was given Prednisone (Exhibit 2F/4) from the Dixie County Health Department.   She returned for follow up the next month and it was noted that she had normal capillary refill upon physical exam.   She was given Darvocet on this visit (Exhibit 2F/2-3).

She returned in August 2006 to Dixie County Health Department for follow up to her complaints of right leg pain.   She reported that her leg was not hurting on this visit.   Musculoskeletal exam was normal.   She was advised that she needed to lose weight or else her leg would not stop hurting (Exhibit 8F/3).

On September 6, 2006, the claimant presented to Dr. Robert Greenberg for a consultative physical exam.   The claimant reported intermittent low back pain over the past 4 years that only bothered her if she sat for long periods of time. She also complained of chronic pain in right hip and leg for past year (not on any medications) and chronic pain in both knees (not on any medications).   She was 5' 9 ½" tall and weighed 263 pounds.   Physical exam revealed normal exam findings except decreased range of motion of the lumbar spine.   She had intact range of motion in all other joints.   She had normal gait and station.   She could walk on her heels and toes as well as stoop.   She had no motor, sensory or reflex abnormalities.   Grip strength and fine manipulation were normal as well. Diagnosis was possible osteoarthritis of lumbar spine, right hip and knees aggravated by morbid obesity (Exhibit 3F).

On September 13, 2006, State Agency physician, Eric Puestow, M.D. reviewed the available medical evidence and opined that there was no severe medically determinable impairment related to the ability to work.   The claimant was overweight with intermittent back and lower extremity pain (70" and 263 pounds). There was mild back limitation of motion with no documented spasm or additional objective exam abnormalities (Exhibit 5F).

On December 13, 2006, the claimant returned to Dixie County Health Department and complained of some depression and abdominal pain. Musculoskeletal exam was normal (Exhibit 8F/2).

On January 30, 2007, State Agency physician, Janet Attlesey, M.D. reviewed the available medical evidence and opined that the claimant did not have any exertional limitations (Exhibit 10F).

In August 2007, she complained of some low back pain with sitting and when she "goes to get up."   She received refill[s] of Tramadol and Lortab (Exhibit 12F/25).

She did not complain of right leg pain again until September 26, 2007 (Dixie County Health Department).   She also had some tenderness to palpation over her lumbar spine but straight leg raising was negative (Exhibit 12F/23).

The claimant did not return for treatment with Dixie County Health Department for about 10 months until July 2008 where she reported left knee pain and alleged that she had dislocated it.   Physical exam revealed tenderness to palpation of left knee.   The claimant was reluctant to have it examined.   It was noted that an ACE wrap was undone and revealed a blue green small bruise.   She would not allow further exam.   Her BMI was noted to be 38.   She was given Ibuprofen and to [sic] was advised to go to ER for further evaluation (Exhibit 12F/21).

The undersigned notes that the remaining treatment notes from Dixie County Health Department were sporadic (one visit in June 2009 and several visits in 2011 - Exhibit 12F/14-18) for her right leg complaints.

In March 2011, she also complained of low back pain for which she had some tenderness noted upon physical exam but excellent range of motion and intact 5/5 motor strength in all of the extremities.   She also complained of some depression. She was given Cyclobenzaprine and Tramadol (Exhibit 12F/17*).*

She continued to follow up in April 2011 for complaints of low back pain for which she was given Prednisone and Flexeril to supplement with her Tramadol (Exhibit 12F/16).

On September 1, 2011, she reported having right leg pain and pain on bottom of her right foot one month ago, which she stated that she no longer had.   Physical exam revealed no edema of the extremities (Exhibit 12F/14).

After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the

intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision.

First, the undersigned notes that the overall objective medical evidence of record is rather sparse.   With regard to her alleged musculoskeletal issues, there is no diagnostic evidence such as x-rays or MRI testing contained in the medical evidence. However, the evidence does show that she has had some conservative treatment in the past that has primarily consisted of medication management. She also has had some physical exam findings that have shown reduced range of motion and tenderness to palpation of her right lower extremity likely related to osteoarthritis.   As to her alleged mental health issues, the undersigned notes that the medical evidence contains the medically determinable impairments depression, ADHD and BIF.   The evidence does not show that she had been referred out to any specialists for her noted depression by her PCP (Dixie County Health Department or that she had complained of such condition causing more than a minimal functional limitation).   At the hearing, she essentially denied having any issues related to her BIF or ADHD.   The undersigned notes that while the claimant was diagnosed with these conditions by the consultative examiner, the overall mental status exam findings were generally benign.   Second, not only has the claimant had rather conservative treatment, the claimant has not had any real medical treatment for her osteoarthritis in almost 2 years (1 year 10 months), which certainly does not support that her conditions are disabling as alleged.   She also admitted at the hearing that she is not currently taking any prescription medications.   Third, the undersigned notes that the claimant's work history is rather poor, which does not enhance her credibility.   Lastly, the undersigned notes that the claimant has a rather good set of activities of daily living in that she is able to take care of 18 dogs and 10 cats.   Physically, she can lift 50-pound bags of pet food.   She admitted she is able to take care of her daily needs, cook food in the microwave, do laundry, wash dishes, prepare the monthly grocery list and go grocery shopping.

As for the opinion evidence, the undersigned notes that there is no opinion from any treating provider regarding any functional limitations or opinions of disability. As for the opinions of the State Agency physicians at Exhibits 5F and 10F, they are given little weight as the undersigned has viewed the evidence most favorably to the claimant and determined that although she has had minimal treatment, she would have some functional limitations.   Having considered her obesity in conjunction with her osteoarthritis as well as portions of her hearing testimony regarding her limited ability to stand/walk, the undersigned has accorded them some weight and determined that she is appropriately limited to sitting up to 7 hours per day but would need to get up once every hour for 1-2 minutes; walking for 4 hours in an 8-hour workday but not for more than 15 minutes at a time.   She could lift up to 20 pounds occasionally and up to 10 pounds frequently.   She is

limited to occasional bending, stooping, climbing ramps or stairs, crouching or kneeling.   She is precluded from crawling or climbing ladders, ropes or scaffolds. She can occasionally reach above shoulder level based upon her complaints of some upper back and shoulder pain although she has intact fine manipulation and grip strength.

As for the mental status exam findings of the consultative examiner, the undersigned gives great weight to the diagnoses and GAF score of Dr. Abeles at Exhibit 4F.   However, the undersigned gives little weight to her opinion that the claimant would be essentially incapable of maintaining employment as this is inconsistent with her GAF scores as well as the claimant's own testimony regarding her functional capabilities.   The claimant testified at the hearing that she is much more capable than opined by Dr. Abeles.   Moreover, the undersigned gave her testimony consideration and limited her to 5th grade level of math and reading with special education (based upon Exhibit 1F) as well as her own testimony in which she testified that she is able to use a computer, prepare a grocery list, perform simple multiplication and division, read grocery labels and able to compare prices and food labels while grocery shopping.   This certainly demonstrates that she is far more capable than Dr. Abeles as well as the other DDS mental health specialists (Exhibits 7F, 9F, 11F) have opined her mental capabilities are in their opinions and therefore, the undersigned has given all of these opinions little weight and instead, giving the claimant's testimony at the hearing far greater weight.   As such, the undersigned finds that in spite of her diagnoses of ADHD and BIF, these are not severe impairments.   Therefore, she is capable of work that is unskilled or semi-skilled.

In sum, the above residual functional capacity assessment is supported by the overall, credible evidence of record for all the reasons discussed in detail above.

R. 301-05.

At step four, ALJ Greer considered **issue number 1** and determined that Plaintiff is unable to perform her past relevant work as a nursery school attendant.   R. 305.   At step five, and unlike ALJ Garcia, ALJ Greer considered **issue number 2** and determined that Plaintiff is able to perform several jobs in the national economy.

R. 306-07.

### C.  Vocational Expert's Testimony

ALJ Greer asked the vocational expert to assume the following:

[A]ssume an individual 32 years old with the work background and education as testified to by the claimant, but just to clarify on the education, it was a special education. . . . So I assume the individual is capable of fifth grade level . . . of math and reading.   And that is based on exhibit -- I think it was in 1F [R. 184-203], some testament [INAUDIBLE] she was 17.   If I assume the individual could sit up to seven hours per day but would need to get up at least once per hour for one or two minutes to loosen up, stand, walk four hours in an eight-hour day but no more than fifteen minutes at a time, lift up to twenty pounds occasionally, ten pounds frequently, occasional bending or stooping, no crawling, occasional stairs, no ladders, ropes, or scaffolds, occasional crouching, occasional kneeling, and occasional reaching above shoulder level, and I want you to also assume that the work would need to be unskilled or semi-skilled.

R. 339-40.   The vocational expert opined that Plaintiff could not perform her past work

"because that job is primarily more standing and walking than sitting down."   R. 340.

The vocational expert also opined that Plaintiff could perform other work in the regional or

national economy such as animal shelter clerk; order clerk; food and beverage;

surveillance system monitor; gate guard; and an office helper.   R. 340-41; *see*

R. 306 (ALJ determination of work).   Plaintiff's counsel inquired further.   R. 341-46.

The vocational expert opined, in part, that it is possible to perform the clerical duties of a

(animal) shelter clerk, order clerk, or office helper with a fifth grade education.   R. 343.

He also opined that if an individual is not working 15 percent of the day or more (excluding

the 30 minutes a day of normal breaks and a lunch break), especially in the low-level jobs

identified by him, the individual would not be able to sustain employment.   Stated

otherwise, if an individual cannot work one-third of a day, the individual cannot work in a

competitive environment.   R. 344-46.

## V.   Legal Analysis

## I.

Plaintiff raises two issues.   First, Plaintiff argues that she is not capable of working

based on her borderline Full Scale IQ score of 72 that was recorded when Plaintiff was in

the 11th grade and the results of Dr. Abeles September 22, 2006, consultative

examination, which indicated Plaintiff had a GAF score of 65, a Verbal IQ score of 75, a

Performance IQ score of 74, and a Full Scale IQ score of 72, placing Plaintiff in the

borderline range of intelligence and further opining that Plaintiff had

attention-deficit/hyperactivity disorder NOS.   R. 238-40.   Plaintiff also relies on a portion

of Dr. Abeles' summary and recommendations in which she opines that Plaintiff "current

level of psychological functioning would probably preclude her from obtaining or

maintaining employment in that she would have a great deal of difficulty in performing her

job on a consistent basis."   R. 240.[5]

Plaintiff provided Dr. Abeles with relevant background information.   R. 238-39.

Dr. Abeles noted that Plaintiff's "vocational history includes seven months of employment

as a bagger at Winn-Dixie, a position she quit because she wanted to be a cashier.   She

has also worked in daycare settings.   The claimant reports last working at a fast food

---

[5]   Dr. Abeles also opined:

It is also recommended that Ms. Shortridge be referred to a psychiatrist to
reassess her current medication regimen.   With appropriate medication
management, the claimant may be capable of obtaining and maintaining manual
labor positions.   Her ability to manage her funds is marginal as her arithmetic
abilities appear limited to fairly simple operations involving addition and
subtraction only.   Prognosis for future success in the workplace, if treatment
recommendations are followed is considered fair.

R. 240.

restaurant in 2004/05, a position she was terminated from after three months after becoming angry with her supervisor."   R. 238.   "She is capable of caring for her daily needs and can prepare meals as well as perform some household chores.   In her leisure, she watches television, lays in bed, and occasionally goes out."   R. 238-39.

At step two, ALJ Greer referred to Dr. Abeles' IQ testing, diagnoses, her opinion regarding Plaintiff "current level of functioning," her GAF score of 65, and some background information she received from Plaintiff.   R. 298-99.   The ALJ also considered other evidence, including Plaintiff's testimony, and concluded that Plaintiff had mild limitations in the functional area of concentration, persistence, or pace. R. 298-300.

At step four and prior to determining whether Plaintiff was capable of performing past relevant work, ALJ Greer considered the relevant evidence in order to determine Plaintiff's RFC.   R. 301-05.   ALJ Greer gave great weight to the diagnoses and GAF score of 65 provided by Dr. Abeles.   R. 305.

ALJ Greer considered Dr. Abeles' opinions in light of the relevant information and gave "little weight" to her ultimate opinion regarding Plaintiff's ability to maintain employment.   ALJ Greer also noted:

> As to her alleged mental health issues, the undersigned notes that the medical evidence contains the medically determinable impairments depression, ADHD and BIF.   The evidence does not show that she had been referred out to any specialists for her noted depression by her PCP (Dixie County Health Department or that she had complained of such condition causing more than a minimal functional limitation).   At the hearing, she essentially denied having any issues related to her BIF or ADHD.   The undersigned notes that while the claimant was diagnosed with these conditions by the consultative examiner, the overall mental status exam findings were generally benign.

R. 304.

Plaintiff also refers, doc. 19 at 27, to a portion of Dr. Greenberg's September 6, 2006, consultative examination report in which he noted that Plaintiff had "[p]robable osteoarthritis of the lumbar spine, right hips, and knees, aggravated by morbid obesity" and that Plaintiff had decreased range of motion (ROM) of the lumbar spine (forward flexion-45˚ (50% reduction); extension-15˚ (right-40% reduction); lateral flexion-15˚ (left and right-40% reduction)).   R. 235-7.[6]

Dr. Greenberg summarized his findings regarding Plaintiff's "extremities."

There was decreased ROM of the lumbar spine.   There was full ROM of all the other joints.   Gait and station were normal.   The patient did not require any assisting device for ambulation.   She was able to tandem walk and could walk on her heels and toes and could stoop.   There were tattoos over the lower back, both lower legs, and upper arms.   Grip strength and fine manipulation were normal. No motor, sensory or reflex abnormalities were noted.   No evidence of active, inflammatory arthritis was present.

R. 235.   ALJ Greer considered Dr. Greenberg's assessment.   R. 303.   ALJ Greer also considered the non-examining opinions of medical consultants, Drs. Puestow and Attlesey, R. 241 (Exhibit 5F), 271-78 (Exhibit 10F), and gave them "little weight" because Plaintiff "would have some functional limitations," contrary to their opinions.   R. 305.

---

[6]  Plaintiff complained that she had intermittent low back pain over the past four years that only bothered her if she sat for long periods of time, although she did not recall having injured her back; complained of chronic pain in her right hip and her entire right leg for the past year, although she did not recall having injured her back or hip, and she took no medication for this complaint; and complained that she has had chronic pain in both of her knees for the past year, making it difficult for her to do any type of bending heavy lifting, although she was not taking medication with this issue.   R. 235.

ALJ Greer also considered Plaintiff's treatment notes from the Dixie County Health Department (health department) in 2006 and 2007.   R. 302-03.   In March 2006, Plaintiff complained of some intermittent right leg pain for which she was given Prednisone and other medications.   R. 207.   She returned for a follow-up visit in April 2006 and it was noted she had normal capillary refill upon physical examination, a negative straight leg test, and given Darvocet and other medications.   R. 205.   Plaintiff returned in August 2006 to the health department for a follow-up to her complaints of having right leg pain, although she reported her leg was not hurting on this visit.   Plaintiff was advised she needed to lose weight or her leg would not stop hurting.

R. 262.   In December 2006, Plaintiff returned to the health department complaining of some depression and abdominal pain (gastritis and gallstones).   A musculoskeletal examination was normal.   R. 260-61.   An abdominal ultrasound indicated Plaintiff had gallstones.   R. 263.   In August 2007, Plaintiff complained of some low back pain when sitting and when "goes to get up."   She received a re-fill of Tramadol and Lortab.   There is also a note that Plaintiff's gallbladder was removed in July 2007.   R. 513.   Plaintiff did not complain of right leg pain until September 2007.   She also had some tenderness to palpation over her lumbar spine, but straight leg raising was negative.   R. 511.

Plaintiff returned to the health department in July 2008 when she reported left knee pain and that she dislocated it when she tried to step up on a stool.   R. 509-10.   The physical examination revealed tenderness to palpation of her left knee.   R. 509.   Plaintiff was reluctant to have it examined.   EMS was called on the day of the injury; they could not transport her to the emergency room.   Plaintiff's left knee was "acewraped" and a

blue green small bruise over the tibial tuberosity was observed.   The patella was non-render at this time.   Plaintiff did not allow further examination of the left knee.   She was given Ibuprofen.   She was warned that her thigh muscles could atrophy if the patella was fractured and she was further told to go to the emergency room for further evaluation. Her BMI was 38.   *Id.*

Plaintiff's remaining treatment notes from the health department were sporadic with two visits in 2009, R. 506-07; no visits in 2010; and five visits is 2011, R. 499-05, when she complained, in part, of low back pain and/or shoulder pain.   In March 2011, she complained of low back pain and had some tenderness, but had excellent ROM and intact 5/5 motor strength in all of her extremities.   She also complained of some depression.   R. 505.   She was given Cyclobenzaprine (as needed for low back muscle tightness) and Tramadol (as need for pain).   *Id.*; *see also* R. 494-97 (medication profile from 2003 through 2012).   In September 2011, Plaintiff reported having right leg pain and pain on the bottom of her right foot one month ago, which she stated she no longer had.   The physical exam revealed no edema of the extremities.   R. 502.   Plaintiff's last reported visit to the health department was in November 2012 when she reported, in part, that her shoulder pain had resolved.   R. 500.

The ALJ appropriately noted:

As for the opinion evidence, the undersigned notes that there is no opinion from any treating provider regarding any functional limitations or opinions of disability. As for the opinions of the State Agency physicians at Exhibits 5F and 10F, they are given little weight as the undersigned has viewed the evidence most favorably to the claimant and determined that although she has had minimal treatment, she would have some functional limitations.   Having considered her obesity in conjunction with her osteoarthritis as well as portions of her hearing testimony

regarding her limited ability to stand/walk, the undersigned has accorded them some weight and determined that she is appropriately limited to sitting up to 7 hours per day but would need to get up once every hour for 1-2 minutes; walking for 4 hours in an 8-hour workday but not for more than 15 minutes at a time.   She could lift up to 20 pounds occasionally and up to 10 pounds frequently.   She is limited to occasional bending, stooping, climbing ramps or stairs, crouching or kneeling.   She is precluded from crawling or climbing ladders, ropes or scaffolds. She can occasionally reach above shoulder level based upon her complaints of some upper back and shoulder pain although she has intact fine manipulation and grip strength.

R. 304-05.

Plaintiff essentially requests this Court to reweigh the evidence and substitute its judgment for that of the ALJ.   That is not the function of this Court.   The ALJ accounted for all of Plaintiff's credibly-established mental and physical limitations in the RFC assessment.   Based upon the foregoing, the ALJ's determination of Plaintiff's RFC, which included consideration of Plaintiff's physical and mental abilities and limitations, is supported by substantial evidence despite her IQ scores and noted physical and mental shortcomings.

## II.

Plaintiff argues that she has never performed substantial gainful activity and has no past relevant work.   Doc. 19 at 28.   Plaintiff cites to a portion of Judge Jones' Report and Recommendation, R. 363-82, entered in the prior case.   Doc. 19 at 29-30.   Judge Jones concluded that ALJ Garcia, not ALJ Greer, erred at step four because he did not address whether Plaintiff's jobs of bagger and fast food worker were past relevant work and instead assumed these jobs qualified as past relevant work despite Plaintiff's low earnings in 1998, 2000, and 2001.   R. 377.   Judge Jones also questioned whether

some of this work was sheltered employment.   *Id.*   Plaintiff concludes her argument

stating: "Nothing has changed.   Substantial evidence still does not support a finding that

Plaintiff Shortridge has ever participated in SGA.   ALJ Garcia is (still) wrong as a matter

of law."   Doc. 19 at 31.

It seems that Plaintiff argues that based on her prior spotty work performance,

which according to Plaintiff is not SGA and cannot be considered as past relevant work,

she cannot, as a matter of law, perform any work, which is the consideration at step five,

not step four.   Yet, Plaintiff does not expressly argue that ALJ Greer erred at step five

when, with the assistance of the vocational expert, *see* R. 340-41, he determined that

Plaintiff could perform several jobs in the national economy.   Unlike ALJ Garcia, ALJ

Greer, again with the assistance of the vocational expert, *see* R. 340-41, determined at

step four that she *could not* perform her past relevant work as a nursery school attendant.

R. 305.   (ALJ Garcia did not comment on whether Plaintiff could perform past relevant

work as a nursery school attendant.   R. 25-26.)

"(1) Definition of past relevant work.   Past relevant work is work that you have

done within the past 15 years, that was substantial gainful activity, and that lasted long

enough for you to learn to do it.   (*See* 416.965(a).)"   20 C.F.R. § 416.960(b)(1).[7]

---

[7]   Substantial gainful activity is work that involves significant mental and physical activities and is usually performed for pay or profit.   The "work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before."   20 C.F.R. § 416.972(a)-(b); <u>Johnson v. Sullivan</u>, 929 F.2d 596, 597 (11th Cir. 1991).   "Gainful work activity is work activity that you do for pay or profit.   Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."   20 C.F.R. § 416.972(b).   Some activities are not considered substantial gainful activity such as "taking care of yourself, household tasks,

Claimants who can still do their past relevant work are not disabled.   If the claimant carries the burden at step four by proving that he or she cannot perform any past relevant work as Plaintiff did in this case, the burden shifts to the Commissioner at step five to establish that despite the claimant's impairments, the claimant is able to perform substantial gainful activity other than their past relevant work in the national economy in light of the claimant's RFC, age, education, and work experience.   20 C.F.R. § 416.960(c)(1)-(2); 20 C.F.R. § 416.920(a)(4)(v), (e), (g)(1); Phillips, 357 F.3d at 1237; Jones v. Apfel, 190 F.3d at 1229; Chester, 792 F.2d at 131; MacGregor v. Bowen, 786 F.2d at 1052.   If the Commissioner carries this burden, the claimant must prove that he or she cannot perform the work suggested by the Commissioner.   Hale v. Bowen, 831 F.2d at 1011.   Claimants who can perform such work are not disabled.   20 C.F.R. § 416.960(c)(1).   Here, Plaintiff did not rebut the ALJ's determination at step five that she can perform several jobs in the national economy.   Substantial evidence supports the ALJ's determination at step five that Plaintiff can perform several jobs in the national economy.

## VI.   Conclusion

Considering the record as a whole, the findings of the Administrative Law Judge were based upon substantial evidence in the record and he correctly followed the law. Accordingly, it is **RECOMMENDED** that the decision of the Commissioner to deny Plaintiff's application for Social Security benefits be **AFFIRMED**.

---

hobbies, therapy, school attendance, club activities, or social programs."   20 C.F.R. § 416.972(c).

**IN CHAMBERS** at Tallahassee, Florida, on July 23, 2014.


<u>s/   Charles A. Stampelos</u>
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**


<u>**NOTICE TO THE PARTIES**</u>

A party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.   A party may respond to another party's objections within 14 days after being served with a copy thereof.   Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.